IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2005 Session

## RHONDA FAY DEMONBREUN v. RICHARD AUSTIN DEMONBREUN

**Appeal from the Circuit Court for Davidson County**
**No. 01D-642      Walter C. Kurtz, Judge**

---

**No. M2004-02105-COA-R3-CV - Filed December 28, 2005**

---

In this post-divorce case, Richard Austin Demonbreun ("Father"), filed a petition to modify the parties' visitation arrangement, seeking additional time with one of the parties' three children. Rhonda Fay Demonbreun ("Mother"), the primary residential parent of the children, countered with a petition requesting an increase in child support and the imposition of an obligation upon Father to pay the children's unreimbursed medical expenses. In addition, Mother sought one-half of the refund associated with the parties' 1998 income tax return, and an award of her attorney's fees and court costs. Following a bench trial, the trial court (1) denied Father's petition to modify visitation with his oldest son; (2) increased Father's child support obligation and his share of non-covered medical expenses; (3) awarded Mother one-half of the 1998 income tax refund; (4) awarded Mother $5,000 in attorney's fees; and (5) ordered Father to pay all court costs. Father appeals all of the trial court's decrees, and Mother seeks an award of attorney's fees for the filing of a frivolous appeal. We affirm in part and reverse in part, but do not find this appeal to be frivolous in nature.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed in Part; Reversed in Part; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Richard Austin Demonbreun, Nashville, Tennessee, Pro Se.

Rose Palermo, Nashville, Tennessee, for the appellee, Rhonda Fay Demonbreun.

**OPINION**

I.

The parties were married on August 13, 1994. At the time, Father was an attorney in private practice and Mother was employed as a pharmacist. Shortly after their marriage, Father adopted Jessica Lauren Demonbreun (DOB: June 25, 1988), Mother's minor child by a previous marriage. Two children were born to the parties' union, Timothy Austin Demonbreun (DOB: July 25, 1997) and Micah Steven Demonbreun (DOB: April 24, 1999).[1]

During the parties' marriage, they purchased a large, old home in Nashville, which they eventually converted into a bed and breakfast known as the "Timothy Demonbreun House." In order to devote more time to their new venture, Father curtailed his law practice and Mother quit her job. Father's law practice in the field of plaintiff's personal injury litigation had been adversely affected, and severely so, by limits placed on direct mail solicitation by the Tennessee Supreme Court.

After eight years of marriage, Mother sought and was awarded an absolute divorce from Father. In its memorandum opinion in the divorce case, the trial court made the following findings with respect to the custody of the three children:

> In considering all the criteria set out at T.C.A. § 36-6-106, the Court grants [Mother] custody of all three (3) children. The Court specifically rejects joint legal custody as not being in the best interests of the children. [Father's] attitude toward two (2) of his children and the parties' inability to have any meaningful communication would make joint custody inappropriate and would not be in the best interests of the children.
>
> [Father]'s visitation is difficult to resolve because of his disparate treatment [of] the three (3) children – Jessica (6/25/88), Timothy (7/25/97), and Micah (4/24/99).
>
> [Father] apparently favors Timothy, has exercised his visitation with Timothy, and seems to have a good relationship with him.
>
> Micah has Down's syndrome. Even though [Father] has had an opportunity to have overnight visitations with Micah, he has not availed himself of that opportunity stating that since his house [i.e, the Timothy Demonbreun House] is not "child proof," it would be dangerous for Micah to visit and it would be difficult for him to run

---

[1]For ease of reference, we will refer to the children in the same manner as did the parties, *i.e.*, "Jessica", "Timothy" and "Micah." No disrespect is intended by this informal approach.

his bed and breakfast with Micah present. Even when picking up Timothy at the day care center, [Father] usually spends only a few minutes with Micah. He professes love for Micah, but his actions belie this expression. At the trial of this case, he again reiterated his love and affection for Micah and the Court wishes to give [Father] every opportunity to have a relationship with Micah.

Jessica is the natural daughter of [Mother] and the adopted daughter of [Father]. At present their relationship is estranged. [Father] claims that [Mother] has poisoned Jessica's attitude toward him and he has not visited with Jessica in many months. [Father's] response to his perceptions of Jessica's attitude has been an effort to set aside the adoption. He has filed several pleadings contending that the adoption was procured by fraud and that this Court should act to set aside the adoption. He has wanted to repudiate his relationship as father of Jessica. He explained that he took this action because his wife would not allow him a relationship with Jessica. If [Father's] allegations about [Mother] are true, he could well have requested the aid of the Court in insuring visitation with Jessica. His immature response was to completely turn his back on Jessica and attempt to negate the adoption. At the final hearing, he professed some remorse for this prior action and now says he wants to reestablish a relationship with Jessica.

* * *

[Father's] professed commitment to his business and his stated lack of time and inappropriate location which has caused him to all but exclude Micah from his life while continuing to devote time and attention to Timothy have not impressed the Court as actions of a committed and loving parent. One has to question why a parent would make voluntary decisions about his vocation which would drastically limit his available time with a son suffering from Down's syndrome while, at the same time, not limiting time with another son. Until [Father] shows full parental commitment to Micah, the Court will continue to doubt his competence as a responsible parent.

(Paragraph lettering in original omitted). The court ordered Father to pay child support in the amount of $2,000 per month; ordered the parties to equally divide the cost of all of the children's medical and dental expenses not covered by insurance; ordered Father to obtain a supplemental health insurance policy covering the children; and ordered Father to pay $6,500 toward Mother's attorney's fees. Because of Father's propensity not to exercise visitation with Micah, the trial court ordered that Father pay an additional $100 in child support for each weekend and holiday under the

parenting plan that he does not spend with Micah, *i.e.*, effectively, an additional $200 of child support per month. The final judgment of divorce was entered on July 3, 2002.

On February 18, 2004, Father filed a petition to modify the trial court's divorce judgment, requesting, *inter alia*, increased visitation time with Timothy. Mother filed a counter-petition, requesting an increase in child support and an increase in Father's contribution toward the children's non-covered medical expenses; an award of one-half of the parties' 1998 federal income tax refund; and an award of fees and court costs.

Following a hearing on June 15, 2004, the trial court announced its ruling from the bench, noting, in pertinent part, as follows:

> I do want to return to my memorandum [opinion from the divorce proceeding] of June 2002 because there's – there's a paragraph – I know this is part of the record, but I think this – this particular paragraph needs to be repeated because I don't think there's been any change in this in 24 months, and it's perhaps the most salient fact here impacting the Court's decision.
>
> ["Father's] professed commitment to his business and his stated lack of time and inappropriate location which has caused him to all but exclude Micah from his life while continuing to devote time and attention to Timothy has not impressed the Court as actions of a committed and loving parent. One has to question why a parent would make voluntary decisions about his vocation which would drastically limit his available time with his son suffering from Down's syndrome while at the same time not limiting time with another son. Until [Father] shows full parental commitment to Micah, the Court will continue to doubt his competence as a responsible parent.["] It – I mean, it's really of note here that this petition asks for additional time, overnight visitation with Timothy, and yet asks no modification that would affect his ability to have overnight visitation with Micah while by his own testimony he hasn't had an overnight visitation with Micah since late summer of '03, and according to [Mother] that's not even accurate; it really didn't happen for 3 1/2 years, but I won't – I won't resolve that dis – or I won't make that credibility call. Let's give [Father] the benefit of the doubt; he hasn't had overnight visitation with Micah since the summer of '03.
>
> Well, since – there – there's another interesting – in – in [Father's] long testimony, and I don't fault him making – as a – as a witness, he didn't have a lawyer, so he really has no option but to engage in a

-4-

kind of stream of consciousness. But in that stream of consciousness, he was discussing his various businesses, his law practice, bed and breakfast, catering, special events venue, and he did say that – you know, he – he hesitated to go back to being a full-time lawyer because he'd have – even have less time to spend with his children because it would be extremely – he'd be extremely busy as a lawyer. But I would note that, you know, even busy lawyers usually have the weekends off. And his problem, his expressed problem in visiting with Micah is his commitments on the weekend.

Well, let me turn first to the request for visitation for Timothy, and I'm going to deny that petition because at this point it strikes me that if [Father] is going to commit additional parental time and resources, it's got to be for Micah. And until he begins to fill the void of Micah for a – for a father, I don't need to tinker with the visitation for Timothy, I guess subscribing to the old adage you've got to walk before you can run.

I will, however, grant his oral request to modify his visitation with Micah. And let's start this way. Twice a month he can have overnight visitations with Micah on either a Tuesday or Wednesday night, and all he has to do is give notice to [Mother] on Sunday night the Sunday before, saying, "I wish to exercise overnight visitation on Tuesday or Wednesday." And he can exercise that option twice in a month, and we'll have that begin July 1, and we'll see how that works. And if – if he can get off his feet and begin to get some visitation with Micah, to begin to establish a real relationship with Micah, then I would certainly consider, down the road, expanding his visitation with Timothy. But right now, as far as the Court is concerned, in the best interest of these children and [Father's] expressed love of both – both his sons and his daughter – I mean, he – he needs to modify his schedule as much as he can to spend some time with – with Micah, and so that would be my judgment on this – this issue.

On the issue of the medical expenses, the parental plan, which was incorporated into the final decree, contemplated [Father] being responsible for medical expenses over and above that paid by [Mother's] insurance policy by procuring a policy of his own for the excess. He says he can't do that, and I don't have any proof here to indicate otherwise, but I think, given the contemplation that he would have that policy and he doesn't, that it's equitable to modify the final decree to say that he is responsible for two-thirds of the medical

expenses over that covered by [Mother's] insurance, and that he's relieved of – given that order, we'll amend out the provision that requires him to get insurance, which he says he can't. And I also note that "medical expenses" is defined in the parenting plan, and I'll adhere to that definition, and it includes mental, dental, orthodontic, and eye care, and prescription drugs, so that will be a modification of that provision.

As far as the IRS check is – I mean, [Mother] did not learn about the IRS check till months after the divorce. It seems to the Court that it's marital property. . . . We have a joint check and for the life of me I can't imagine how the – the bank negotiated the check without [Mother's] signature on it, but that appears to be the case.

But consistent with the decision I made in [a previous case], I think – and consistent with principles of equity – [Mother] is entitled to $1,600. And part of that division comes from this judge's view of the unauthorized cashing of that check made out to both of them, so I'm going to grant her a judgment of $1,600 based upon that unauthorized cashing of that – of that check, which has got to be defined as marital property. Now, granted, just like in [a previous case], [Father's] got a case that if the matter had gotten to court, perhaps he should have been the beneficiary of the amount, but he decided to take that on his own shoulders.

* * *

Now, let me go back to one matter about Micah. It seems to me in addition to the visitation that I've granted with Micah that if [Father] wants to sort of I guess you'd say take Micah out of the day care facility, I think he should be allowed to do this up to four times a month, as long as it's coordinated with the facility; so that if he gets a spare couple of hours in the afternoon and he calls down there and there's not any planned activity and he can drive down there and take Micah out, I think that's okay; and it ought to be authorized, and I'll trust him to call ahead and just make sure that it doesn't interfere with any planned activity.

Child support. You know, this issue of determining income for the self-employed is difficult, and the case law recognizes that difficulty; but I think by [Father's] own admission, while granted this is a – a sort of a rough calculation and it almost has to be a rough calculation, but I think he conceded in his testimony that his gross income has

-6-

increased since 2002, and he's explained about the $89,000 in wages, the $90,000 a year in mortgage payments, the $120,000 a year in other expenses between eight or ten thousand dollars, and I realize anybody who runs a small business has to make other permanent nonroutine payments. But still by his own admission in the e-mail, it's – "It is apparent now that business and cash flow are sufficient to sustain growth, so I can now begin to pay others to do many of the things I've been forced to do the past three years. I'm also beginning to advertise and campaign regarding my law practice, which should serve to reestablish it so that I can once again enjoy what I was educated to do." So I – I can conclude as a matter of fact that he has had an increase in his financial fortunes and an increase in his available funds.

Now let me turn to another factor. I mean, when this order was entered in June 2002, I mean, I was aware that, you know, Micah was a child that took a lot of extra care. That's not only extra emotional care, an extra commitment by especially [Mother], but, obviously, an additional financial strain by what she is required to do. And I did have an expectation that [Father] would exercise his visitation to at least a much greater degree than he did as set out in the final decree, and he has not done that. The – I mean, gosh, I don't know how to put a percentage on it, but it would seem to be that 95 percent of the responsibility – gosh, maybe more – for Micah is on her shoulders. The child support guidelines, you know, contemplate reasonable visitation because when you visit with someone, you accept some living expenses, but that hasn't happened here.

I think taking into consideration the almost 100 percent obligation of care placed on her for Micah, the fact that [Father's] financial condition has improved, and recognizing the vagaries involved in determining exactitude when you're – when you're dealing with somebody who is self-employed, which is recognized in the case law, that a child support increase of $500 per month here is warranted.

Now, the $200 nonvisitation penalty is – I guess, I'm calling it that for lack of anything else – is set aside, so the monthly child support payment will be increased to $2,500. And I think under all the circumstances, that's consistent with the principles of equity; and it's consistent with the child support guidelines based upon the information I have available to me. I also think that under these circumstances [Mother] is entitled to an attorney fee in the amount of $5,000, and that – that's the judgment of the Court, . . . .

The trial court subsequently entered its final judgment. It was consistent with the memorandum opinion. From this judgment, Father appeals.

## II.

Our review of this non-jury case is *de novo* upon the record with a presumption of correctness as to the trial court's factual findings, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). The trial court's conclusions of law are not accorded the same deference. *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997).

## III.

## A.

Father raises the following issues for our review:

> 1. Did the trial court err in ordering an increase in Father's child support obligation?
>
> 2. Did the trial court abuse its discretion in ordering Father to pay all court costs and Mother's attorney's fees?
>
> 3. Did the trial court err in increasing Father's obligation for non-covered medical expenses?
>
> 4. Did the trial court err in awarding Mother one-half of the parties' 2002 income tax return?
>
> 5. Did the trial court err in refusing to award Father additional visitation time with Timothy?

Mother, on the other hand, urges us to hold that Father's appeal is frivolous in nature. She seeks an award of attorney's fees for a frivolous appeal. We will address each of these issues in turn.

## B.

Father first contends that the trial court erred in increasing his basic child support obligation from $2,000 per month to $2,500 per month. We agree with this contention.

When a petition to modify child support is filed based upon a change in an obligor's net income, a trial court, in an appropriate case,[2] can order an increase or decrease in support "when there is found to be a significant variance, as defined in the child support guidelines . . ., between the guidelines and the amount of support currently ordered." Tenn. Code Ann. § 36-5-101(a)(1)(A) (Supp. 2004). The child support guidelines define a significant variance as "at least 15% if the current support is one hundred dollars ($100.00) or greater per month . . . ." Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3) (2003). The party seeking the modification of the child support order has the burden of proving the existence of a significant variance. *See **Turner v. Turner***, 919 S.W.2d 340, 345 (Tenn. Ct. App. 1995); ***Seal v. Seal***, 802 S.W.2d 617, 620 (Tenn. Ct. App. 1990).

Father is a sole proprietor, *i.e.*, the self-employed owner of a law practice and a bed and breakfast facility. Mother essentially bases her request for more child support on Father's 2003 *gross* income of $500,000 and an email he sent her indicating that his "business and cash flow are sufficient to sustain growth." Mother takes the position that all of this shows that there has been a "significant variance," as defined in the guidelines. The trial court tacitly agreed with Mother that there had been the necessary predicate showing to justify another look at Father's child support obligation. We respectfully disagree with this conclusion.

"[T]he child support award is based on a flat percentage of the obligor's *net* income" as that concept is defined in the guidelines. Tenn. Comp. R & Regs., ch. 1240-2-4-.03(2) (emphasis added). While an obligor's *gross* income is the starting point of the percentage child support calculation, it is far from the final step. The *gross* income of a self-employed individual, such as Father, must be reduced by "reasonable expenses necessary to produce such income." Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(3)(a)(2).[3] Once this has been accomplished, a further adjustment must be made for the significant matter of federal income taxes. *See* Tenn. Comp. R. & Regs. 1240-2-4-.03(4)(b). In the

---

[2] We say "in an appropriate case" because all child support awards and modifications of same are subject to the overarching concept of non-applicability of the guidelines in the event the imposition of those provisions would be "unjust or inappropriate." *See* Tenn. Code Ann. § 36-5-101(e)(1)(A) (2005).

[3] The Supreme Court has contrasted the precise nature of the percentage child support calculation for a salaried individual with that of a self-employed obligor:

> These guidelines, when applied to an obligor whose income is derived from a salary and an occasional bonus or dividend, yield an easily quantitated child support amount. Once the obligor's income has been determined and the Child Support Guidelines have been applied, the calculation of child support is made with certainty, predictability, and precision.
> Although achieving such precision is possible when calculating child support owed by a salaried obligor, the calculation is much more difficult and much less precise when the obligor is self-employed. The Child Support Guidelines therefore provide a different method for calculating a self-employed obligor's income. In the self-employed obligor's situation, the guidelines require the trial court to consider all income of the obligor parent, reduced only by reasonable expenses to produce the income.

***Taylor***, 158 S.W.3d 352, 357-58 (internal citation omitted).

instant case, Mother, as the moving party, had the burden to show that there had been a "significant variance." Thus, it was her burden to show the expenses[4] "necessary to produce" the $500,000 of gross income and the appropriate deduction for taxes. It was not Father's obligation to prove what these expenses and taxes were.

This is not a case where an obligor fails to produce the necessary "evidence of income." Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(3)(f). Father contends – and Mother does not deny – that she was afforded access to all of Father's records bearing upon the conversion of his *gross* income to *net* income. For whatever reason, she chose not to present evidence of Father's *net* income, relying instead on Father's gross income and his "sufficient to sustain growth"[5] statement regarding his businesses.

We recognize that there is proof in the record of "in kind" remuneration. It is clear that a court can take such remuneration into consideration in establishing one's gross income. *See* Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(3)(a)(3). However, no attempt was made in this case to value Father's lodging and other benefits of the multi-use of his bed and breakfast with its attendant in-kind benefits to Father.

Child support under the guidelines is expressed as a percentage of *net* income. It was incumbent upon Mother, as the moving party to present evidence of Father's *net* income. This she failed to do. Because Mother failed to carry her burden of proving a significant variance, we hold that the evidence preponderates against the trial court's finding that there has been a significant variance supporting an increase in Father's child support obligation. Accordingly, we reinstate the previous child support award of $2,000 per month,[6] retroactive to July 1, 2004, the effective date of the trial court's modification of child support.

C.

Father next asserts that the trial court abused its discretion in taxing all court costs to Father and in ordering Father to pay $5,000 toward Mother's attorney's fees. We disagree.

Tenn. Code Ann. § 36-5-103(c) (2005) provides as follows:

---

[4]Such expenses are likely to have included the following: payroll, food, interest, property taxes, other local taxes and fees, office supplies, building supplies, laundry, repairs, maintenance, utilities, travel, printing, advertising, freight, and office expenses, to name a few.

[5]We do not understand how this nebulous statement can have a significant bearing on Father's "bottom line," *i.e.*, his *net* income.

[6]The propriety of the trial court's deletion of the $200 per month add-on for Father's failure to visit Micah was not raised as an issue on appeal.

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Under this statute, an award of legal expenses in a suit pertaining to visitation, an obvious aspect of custody, "is discretionary with the trial court." *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992). While the ability to pay of the party requesting fees is a factor to be considered in determining whether the other party should be onerated with the fees of the other, a trial court "may award attorney's fees without proof that the requesting party is unable to pay them as long as the award is just and equitable under the facts of the case." *Id*.

Mother successfully defended Father's petition with respect to visitation. Under the circumstances presented by the record before us, we find no support for a conclusion that the trial court abused its discretion in awarding Mother her attorney's fees. Furthermore, we find no abuse of discretion in the trial court's decision to burden Father with the payment of court costs.

D.

Next, Father argues that the trial court erred in increasing Father's monetary obligation for the children's unreimbursed medical expenses from one-half to two-thirds. We find Father's argument on this issue to be without merit.

In the parenting plan which accompanied the parties' final judgment of divorce, the trial court ordered Father to pay one-half of all of the children's medical expenses not covered by health insurance. In addition, the trial court ordered Father to obtain a supplemental health insurance policy on the children. At the hearing on the petition to modify, Father testified that he was unable to obtain such a supplemental policy,[7] and the trial court noted that it had no proof "to indicate otherwise." The trial court therefore removed from the parenting plan the provision requiring Father to obtain a supplemental insurance policy. However, to compensate for the lack of this policy, the court increased Father's obligation for non-covered medical expenses from one-half to two-thirds. We find no abuse of discretion in this increase, and accordingly, we decline to disturb the trial court's ruling on this matter.

---

[7]Father testified that he could not obtain such a policy because the children did not live with him.

E.

Father next contends that the trial court erred in awarding Mother one-half of the parties' 1998 income tax refund. We again disagree.

As a general rule, a trial court's division of marital assets is not subject to modification. *Johnson v. Johnson*, 37 S.W.3d 892, 895 (Tenn. 2001). However, if a particular marital asset was not addressed in the final judgment of divorce, it is permissible for a court to make a division of that asset at a later date. *See Simpkins v. Blank*, No. M2002-02383-COA-R3-CV, 2003 WL 23093849, at *5 (Tenn. Ct. App. M..S., filed December 30, 2003). By definition, such a division cannot be interpreted as a modification of the original judgment since the asset in question was not mentioned and addressed in that judgment.

In the instant case, Father – in August, 2002 – filed an amended tax return for the year 1998. The Internal Revenue Service then issued a check payable to Father and Mother *jointly* in the amount of $3,267. Father somehow managed to deposit this check into his operating account without Mother's signature. Because this refund was not even requested, much less received, until after the parties' divorce became final, it is difficult to understand how it could have been contemplated at the time of the divorce. Not surprisingly, it is not specifically mentioned in the judgment of divorce. The trial court did not err in dividing this asset at the June, 2004, hearing.

Because the refund check was issued for a year in which the parties were married, we cannot say that the evidence preponderates against the trial court's decision to consider the refund to be marital property and to award Mother $1,600, which constitutes half of the refunded amount.

F.

Finally, Father argues that the trial court erred in refusing to modify visitation to allow him increased time with his older son, Timothy. We find no error in the trial court's ruling on this matter.

When seeking a modification of visitation, the moving party must show, by a preponderance of the evidence, (1) that a material change of circumstances has occurred, and (2) that such a change has affected the child's best interest. Tenn. Code Ann. § 36-6-101(a)(2)(C) (2005). If the moving party is successful in proving a change of circumstance, such a change merely opens the door to a re-examination of the visitation arrangement; it does not, *ipso facto*, require a modification of that arrangement.

In the instant case, the trial court – in its memorandum opinion at the time of the divorce – admonished Father regarding his preferential treatment of Timothy and urged Father to show more of a commitment to Micah by exercising the visitation with Micah to which he was entitled. A year and a half later, Father filed a petition to modify, and his sole request was that the court award him

additional visitation with Timothy. While Father acknowledged at the hearing on his petition that he had only exercised overnight visitation with Micah on one occasion, he claimed that this was due to the fact that he was unable to exercise the weekend visitation which he had been awarded. Father advanced various reasons for this inability; to wit, he cannot devote an additional bedroom in his bed and breakfast for Micah; he cannot place a latch on the door of a bedroom for Micah in order to prevent him from trying to get out of the bedroom during the night; he cannot take Micah to a hotel room as he is occasionally forced to do for himself and his wife when every bedroom – including their own – is rented; and he cannot hire a sitter for an entire weekend in order to watch Micah. Father did, however, make an oral request at trial that the parenting plan be amended to allow him to exercise overnight visitation with Micah on weeknights, when Father is less likely to have bed and breakfast guests and when he would ostensibly have more time to devote to Micah.

At the conclusion of the most recent hearing, the trial court reiterated its concern that Father was not showing enough of a commitment to Micah, and as a result of that concern, the trial court denied Father's request for increased visitation with Timothy, stating that "if [Father] is going to commit additional parental time and resources, it's got to be for Micah." The trial court did, however, grant Father's request to modify the visitation schedule for Micah, allowing Father to exercise overnight visitation with the child twice a month on either a Tuesday or Wednesday. The court went on to add that if Father demonstrated progress in his commitment to Micah, that it would consider allowing more visitation with Timothy in the future.

The fact that the court obviously took a new look at the issue of visitation going forward indicates an implicit finding of a change of circumstances; otherwise, there would have been no reason for the trial court to take a fresh look at this issue. However, having examined anew the issue of increased visitation with Timothy, the trial court determined that such an increase would not be in the best interest of the children and therefore denied Father's request.

Father argues this denial was in error, contending that the fact Timothy is two years older than he was at the time of the divorce and that the child is having some difficulty with school are sufficient reasons to justify the increased visitation sought by Father. While it is true that "*changes* relat[ed] to age," (emphasis added), can constitute a material change of circumstance, it is only one factor that "may" be considered when determining the propriety of a modification of visitation. *See* Tenn. Code Ann. § 36-6-101(a)(2)(C). The trial court listened to all of the testimony and, after hearing and considering all of it, determined that a modification of Father's visitation with Timothy was not in the best interest of Timothy or the other two children. Furthermore, with respect to Father's assertion that Timothy's difficulty in school is enough to warrant a change in visitation, Father failed to show that the difficulty in school was attributable to anything Mother was or was not doing, or that Father's additional time with the child would do something to remedy the situation. Accordingly, we find nothing in this record to indicate that the evidence preponderates against the trial court's decision to deny Father's request for increased visitation with Timothy.

Father contends that the trial court's decision not to increase his visitation with Timothy reflects the court's effort to "punish" him for not visiting with Micah. We do not view the trial

court's most recent decree regarding the subject of visitation as an act of punishment. The court did nothing to lessen Father's visitation time with Timothy, and it even went so far as to adjust Father's visitation time with Micah in an attempt to accommodate Father's schedule. Indeed, the court indicated to Father that, if his relationship with Micah developed and improved, it would consider expanding Father's visitation time with Timothy in the future. It is clear to us that these actions by the trial court are not punitive in nature; rather, they are a reasonable attempt by the court to foster a relationship between Father and Micah.

While Father makes much of the fact that Micah's "special needs" status imposes "intolerable requirement[s]" on Father's ability to keep him overnight, we believe Father's protestations ring hollow. The fact is that Father did nothing to demonstrate to the court that the circumstances were such that he was unable to keep Micah overnight. Father states that he would have to convert one of the guest rooms for Micah's use, which would prevent Father from renting out that room. However, Father testified that Timothy slept on a sofa in a sitting room adjacent to the master bedroom when he stayed with Father on weekends. Common sense would dictate that Micah would be able to sleep on the floor in a sleeping bag or on an air mattress. Father argues that, in order to keep Micah overnight, he would have to place a latch on the bedroom door, and that this child-proofing "would render [the room] unusable for guests." We simply cannot conceive that a patron of Father's bed and breakfast would in any way be offended by a latch on their bedroom door. Father asserts that he could not afford nor would he trust "a weekend, live-in babysitter," which he claims he would need in order to keep Micah overnight and to provide him with constant supervision. We first note that most young children require constant supervision, regardless of their disabilities. We must also point out that Mother faces these same supervisory issues on a daily basis and hires a sitter when necessary, and, unlike Father, Mother does not have the assistance of a spouse.

However, Father's concerns over his bed and breakfast guests and his weekend responsibilities should no longer be an issue, as the trial court granted his request to alter his visitation with Micah to permit Micah to spend a weeknight with Father twice a month. We do find it puzzling that Father repeatedly emphasizes in his brief before this court his utter inability to keep Micah overnight *at any time*, not just on weekends, particularly in light of Father's *specific request* for weeknight visitation during the course of the hearing. It appears as if Father has fallen victim to the old adage, "Be careful what you wish for – you might just get it."

In short, we hold that the trial court did not abuse its discretion in holding that Father must spend more time with Micah before considering an increase in visitation with Timothy.

G.

By way of a separate issue, Mother urges us to find Father's appeal to be a frivolous one, and, as a consequence of this requested finding, asks for an award of her attorney's fees on appeal. As Father has prevailed on the issue of child support, there is no basis for a finding of a frivolous appeal. Accordingly, we decline Mother's request for an award of attorney's fees for a frivolous appeal.

## IV.

The judgment of the trial court is affirmed in part and reversed in part. Father's original child support obligation of $2,000 per month is hereby reinstated retroactive to the date when it was increased. This case is remanded to the trial court for enforcement of that portion of the court's judgment that is consistent with this opinion and for the collection of costs assessed below, all pursuant to applicable law. Exercising our discretion, we tax the costs of this appeal one-half to each party.

 

 

_____

CHARLES D. SUSANO, JR., JUDGE